UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CORTNEY DUNLAP,<br>*Petitioner,*<br><br>v.<br><br>WARDEN FMC DEVENS,<br>*Respondent.* | No. 24-cv-11462-RGS |

**REPORT AND RECOMMENDATION ON RESPONDENT'S MOTION TO DISMISS**

LEVENSON, U.S.M.J.

INTRODUCTION

Petitioner Cortney Dunlap, a prisoner currently serving a federal sentence in this District, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, asserting that the Bureau of Prisons ("BOP") improperly denied him Earned Time Credits ("ETCs") to which he is entitled under the First Step Act ("FSA").

Under the FSA, eligible prisoners may earn ETCs by participating in evidence-based recidivism reduction ("EBRR") programming assigned by the BOP. Mr. Dunlap contends that he should have received ETCs for participating in programming while he was held at a non-BOP facility, where he was placed for nearly two months, apparently to facilitate his transportation on a writ of habeas corpus to a hearing related to restitution in his case. The BOP counters that, under its administrative rules, the programming Mr. Dunlap completed at the non-BOP facility does not qualify as EBRR programming because the programming was not assigned by the BOP, so Mr. Dunlap is not entitled to receive ETCs for those efforts.

There is no real dispute in this case about the meaning or effect of the BOP's administrative rules. Rather, the question for the Court is whether those rules, as written or as applied, violate the FSA.

## I. Legal Background

### *A. The First Step Act*

Enacted in 2018, the FSA tasked the Attorney General with developing a "risk and needs assessment system" to (among other things) classify federal prisoners by their recidivism risk, determine the type of EBRR programming appropriate for each prisoner, and "assign each prisoner to such programming accordingly." 18 U.S.C. § 3632(a) (describing the risk and needs assessment system). The FSA further requires the periodic reassessment of a prisoner's recidivism risk classification to inform whether the prisoner should be reassigned to appropriate EBRR programming or productive activities[1] "to ensure that . . . all prisoners at each risk level have a meaningful opportunity to reduce their classification during the period of incarceration . . . and . . . are able to successfully participate in such programs." *Id.*

The FSA provides for incentives to encourage participation in EBRR programming. These incentives, which are awarded for "successful participation" in EBRR programming, include the opportunity for eligible prisoners to earn ETCs and thus reduce their time in prison. *See* § 3632(d)(4). Except for prisoners who are ineligible because they are serving time for certain enumerated offenses, prisoners can earn ETCs in two ways under the FSA: (1) a prisoner

[1] The FSA and the BOP's administrative rules often discuss EBRR programming and "productive activities" together, but the two are distinct and the BOP's rules define them separately. *See* 28 C.F.R. § 523.41(a)–(b). Because Mr. Dunlap's argument in this case is based on his participation in programming at a non-BOP facility, not on participation in "productive activities," I focus here on EBRR programming, even when the statute or rule being discussed also mentions productive activities.

earns 10 ETCs for every 30 days of successful participation in EBRR programming, and (2) a prisoner who is classified as having a low recidivism risk and who maintains that low classification over 2 consecutive risk assessments earns an additional 5 ETCs for every 30 days of successful participation in EBRR programming.[2] § 3632(d)(4)(A); *see* § 3632(d)(4)(D) (enumerating offenses associated with ineligibility).

### *B. The BOP's Administrative Rule*

To implement the FSA, the BOP developed an administrative rule, codified at 28 C.F.R. § 523.41 (the "Rule"). Although the FSA does not define "successful participation" in EBRR programming, the Rule supplies a definition. The Rule provides that, to deem a prisoner to have successfully participated, BOP staff must determine that the prisoner has participated in assigned programming and has complied with each program's requirements. 28 C.F.R. § 523.41(c)(2). The definition allows for some flexibility, so that "[t]emporary operational or programmatic interruptions authorized by the [BOP] that would prevent an inmate from participation in EBRR programs or [productive activities] will not ordinarily affect an eligible inmate's 'successful participation' for the purposes of FSA Time Credit eligibility." *Id.* § 523.41(c)(3). However, the Rule's definition is, in significant part, a matter of exclusion: it also provides that prisoners "will

[2] In discussing the FSA, the parties note a second ground for ineligibility to earn ETCs, which does not appear relevant to this matter. *See* Docket No. 29, at 6; Docket No. 31, at 8. Their characterization is functionally, but not technically, correct. Prisoners who are "the subject of a final order of removal" (*i.e.*, a deportation order) are ineligible to *apply* ETCs, whereas prisoners serving time for certain enumerated offenses are ineligible to *earn* ETCs. *See Calderon Hernandez v. Warden FMC Devens*, No. 23-CV-11330-MPK, 2023 WL 5939634, at *3 (D. Mass. Sept. 12, 2023). *Compare* § 3632(d)(4)(D) (enumerating offenses associated with ineligibility), *with* § 3632(d)(4)(E) ("A prisoner is ineligible to apply time credits under subparagraph (C) if the prisoner is the subject of a final order of removal under any provision of the immigration laws . . . .").

generally not be considered to be 'successfully participating'" in EBRR programming in various situations "including, but not limited to":

> (i) Placement in a Special Housing Unit;
>
> (ii) Designation status outside the institution (*e.g.*, for extended medical placement in a hospital or outside institution, an escorted trip, a furlough, etc.);
>
> (iii) Temporary transfer to the custody of another Federal or non–Federal government agency (*e.g.*, on state or Federal writ, transfer to state custody for service of sentence, etc.);
>
> (iv) Placement in mental health/psychiatric holds; or
>
> (v) "Opting out" (choosing not to participate in assigned programming).

*Id.* § 523.41(c)(4).

Although it is not explicit in the Rule, the BOP apparently applies the Rule in such a way that eligible prisoners receive ETCs even on days when they do not actually participate in EBRR programming, so long as they were eligible, willing, and in a position to participate. In an affidavit attached to Respondent's motion to dismiss, the Case Management Coordinator at Devens explained the BOP practice as follows:

> Under BOP's time credit regulations, inmates automatically earn one day of programming credits for each day that passes, without regard to program completion or the number of hours actually spent in any particular program or activity, provided the inmate does not fall within one of the categories [establishing ineligibility] enumerated in 28 C.F.R. § 523.41(c)(4). In practice, this means inmates are not necessarily required to be participating in EBRR/[productive activities] specifically recommended to them on a particular given day to earn credits. Rather, an inmate must be willing and in a position to participate in EBRR/[productive activities] specifically recommended to the inmate by prison officials under the risk and needs assessment system.

Docket No. 31-1, ¶ 17. In addition, beyond the express provisions of the Rule, the BOP considers prisoners to be successfully participating, and thus earning ETCs, immediately upon arrival at their designated institutions—before they are assessed or assigned to EBRR programming. *See id.* at ¶¶ 18–19.

## II. Factual Background

On March 11, 2022, the U.S. District Court for the District of Connecticut sentenced Mr. Dunlap to 57 months in prison (later reduced to 50 months) and 3 years of supervised release. Docket No. 29, at 2. He was designated to Federal Medical Center Devens ("Devens") and, on July 1, 2022, he reported there and began serving his sentence. *Id.* The BOP considered him to be "in 'earning' status" (*i.e.*, accruing ETCs), beginning on that day. Docket No. 31-1, ¶ 23.

Mr. Dunlap had originally been scheduled to appear at a judgment debtor hearing in the District of Connecticut on June 29, 2022 (prior to his self-surrender). Docket No. 29, at 3. That hearing, however, was cancelled on short notice when his counsel fell ill. *Id.* After Mr. Dunlap began serving his sentence, the hearing was rescheduled for August 9, 2022. *Id.*

On July 15, 2022, two weeks after Mr. Dunlap's arrival at Devens and about three and a half weeks before the rescheduled hearing, the BOP transferred him from Devens to the Wyatt Detention Facility ("Wyatt"), a non-BOP facility in Rhode Island.[3] *Id.* at 4. Once Mr. Dunlap was transferred to Wyatt, the BOP no longer considered him to be earning ETCs. Docket No. 31-1, ¶¶ 23, 26, 28.

It was not until September 8, 2022—about a month later—that the BOP returned Mr. Dunlap to Devens. Docket No. 29, at 4. In total, he was away from Devens, his designated facility, for 53 days, all in order to attend a hearing that lasted approximately two hours. *Id.*

---

[3] Mr. Dunlap's judgment debtor hearing was held in Bridgeport, Connecticut. *See United States v. Dunlap*, No. 21-cr-00095-KAD-1 (D. Conn. July 6, 2022), ECF No. 99 (setting the hearing). Thus, it appears that the court in question lies approximately 127 miles by road from Wyatt and approximately 142 miles by road from Devens. Although the point is not developed in the record, it seems likely that transportation between Wyatt and the courthouse was logistically easier (Wyatt commonly houses pretrial detainees, who are routinely transported to courthouses in adjacent states).

While held at Wyatt, Mr. Dunlap apparently completed seven programs on topics such as "Victim Impact" and "Rational Thinking." *Id.* As discussed below, the BOP—applying its Rule—did not count these efforts as "successful participation" in assigned EBRR programming. In computing Mr. Dunlap's expected release date, the BOP considers that he began earning ETCs again only upon his return to Devens on September 8, 2022. Docket No. 31-1, ¶ 29.

**III. Procedural Background**

On June 3, 2024, acting pro se, Mr. Dunlap filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. *See* Docket No. 1. On June 28, 2024, by order of the Court, a duplicative habeas corpus action filed by Mr. Dunlap was dismissed, and the petition from that action was filed in this action as an amended petition. *See* Docket Nos. 5, 6. The matter was referred to me on August 6, 2024, *see* Docket No. 14, and Respondent filed a motion to dismiss for failure to state a claim on September 10, 2024, *see* Docket No. 21.

I held a status conference on September 13, 2024, at which time I appointed Attorney Gant to represent Mr. Dunlap and requested further briefing from the parties. *See* Docket No. 25. In accordance with the briefing schedule adopted by the Court, *see* Docket No. 27, Mr. Dunlap filed an amended petition on September 30, 2024, *see* Docket No. 29, Respondent filed a new motion to dismiss on October 14, 2024, *see* Docket No. 30, and Mr. Dunlap filed a response on October 25, 2024, *see* Docket No. 32. I heard argument on the motion on November 1, 2024. *See* Docket No. 34. Mr. Dunlap also filed a notice of supplemental authority on November 13, 2024. *See* Docket No. 35.

**IV. The Parties' Arguments**

***A. Mr. Dunlap's Arguments***

Mr. Dunlap's primary argument is that the Rule under which the BOP denied him ETCs conflicts with the statutory language of the FSA. He argues that the classes of prisoners who are

ineligible to earn ETCs under the Rule are broader than the classes explicitly identified in the FSA. *See* Docket No. 29, at 4–5. In particular, Mr. Dunlap points to the Rule's listing of circumstances under which prisoners "will generally not be considered to be 'successfully participating'" in EBRR programming, including—of relevance to this case—a prisoner's "[t]emporary transfer to the custody of another Federal or non-Federal government agency (*e.g.*, on state or Federal writ, transfer to state custody for service of sentence, etc.)." *See* Docket No. 29, at 9–10 (quoting 28 C.F.R. § 523.41(c)(4)). Mr. Dunlap supports his argument with citations to several decisions by courts that have concluded that the Rule, as it has been applied in various contexts that are arguably similar to the matter at bar, conflicts with the express provisions of the FSA. *See id.* at 8–9. Those courts have ordered the BOP to award ETCs that it had previously denied. *See id.*

In addition to his argument that the Rule improperly renders him ineligible to earn ETCs, Mr. Dunlap argues that the BOP's definition of "successful participation" is too narrow. *See id.* at 9–15. He notes that the FSA itself does not define "successful participation," and he argues that the Rule's definition, which states that prisoners on a writ "will generally not be considered to be 'successfully participating,'" yields unfair results that the Court should find to be at odds with the FSA. *See* Docket No. 29, at 9–15 (quoting 28 C.F.R. § 523.41(c)(4)).

Important to both of Mr. Dunlap's main arguments is that the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024), has worked something of a change in the way the Court must consider an agency's rulemaking. In the wake of *Loper Bright*, Mr. Dunlap argues, the "BOP's construction of the FSA should be entitled to no deference, especially where its application here produces an unfair and unreasonable ineligibility determination." Docket No. 29, at 11.

Along with his arguments that the Rule conflicts with the FSA, Mr. Dunlap also points to various aspects of the Rule that seem internally inconsistent, or just plain unfair, although he does not argue that these directly conflict with the statute. He points out, for instance, that under the Rule BOP deems prisoners to be "successfully participating" in EBRR programming during "[t]emporary operational or programmatic interruptions authorized by the [BOP] that would prevent an inmate from participation in EBRR programs." 28 C.F.R. § 523.41(c)(3); *see* Docket No. 29, at 13. Mr. Dunlap notes that this carveout, as well as further BOP interpretations of the Rule (*e.g.*, in a BOP program statement), operates to prevent prisoners from losing ETCs due to circumstances beyond their control. *See* Docket No. 29, at 13–14 (pointing to the BOP's Program Statement regarding its implementation of the FSA, which interprets the Rule as allowing prisoners to earn ETCs while on a waitlist for a program). Mr. Dunlap contends that it is unfair and arbitrary that such liberality does not extend to his circumstances—given that he was held away from a BOP facility for reasons out of his control and that he actively pursued and participated in programming during that time.[4] *See id.*

### *B. Respondent's Arguments*

Respondent argues that the FSA requires only that the BOP afford prisoners ETCs for successfully participating in EBRR programming that has been assigned by the BOP. *See* Docket

---

[4] Mr. Dunlap also argues that he has exhausted his administrative remedies and argues in the alternative that, if he has not, the Court should waive the exhaustion requirement. *See* Docket No. 29, at 15. Respondent has not argued that Mr. Dunlap failed to exhaust his administrative remedies, so Respondent has waived any such argument. *See Gonzalez v. Pierre-Mike*, No. 23-CV-11665-IT, 2023 WL 5984522, at *2 n.1 (D. Mass. Sept. 14, 2023) ("Here, BOP does not contend that Petitioner has failed to exhaust his administrative remedies, so the court treats that argument as waived."); *cf. Idada v. Spaulding*, 456 F. Supp. 3d 294, 297 (D. Mass. 2020) (noting that the exhaustion requirement for § 2241 petitions is a common law doctrine and that "common law 'exhaustion doctrine[s] . . . apply as a matter of judicial discretion'" (alterations in original) (quoting *Darby v. Cisneros*, 509 U.S. 137, 153–54 (1993))).

No. 31, at 5. In Respondent's view, Mr. Dunlap was "eligible" to earn ETCs while he was away from Devens, but he did not "successfully participate" in any EBRR programming during that time. *See id.* at 8, 10. Respondent acknowledges that Mr. Dunlap completed programming that was available at the non-BOP facility where he was held, but Respondent argues that such programming does not satisfy the FSA's requirements because it was not assigned by the BOP. *See id.* at 10–11. Relying on this distinction between eligibility and successful participation, Respondent contends that the Rule is consistent with the FSA and does not impermissibly create a new category of ineligibility. *See id.* at 9–11. Instead, Respondent argues, the Rule merely sets forth circumstances under which a prisoner will "generally" be unable to successfully participate in EBRR programming. *See id.* Respondent summarizes the argument thus: "In short, if a prisoner cannot participate in BOP-assigned programming—whatever the reason—he generally is not entitled to FSA credit." *Id.* at 12.

Respondent obliquely addresses Mr. Dunlap's argument regarding the unfairness of denying him ETCs when he had no control over his absence from Devens. *See id.* at 12–13. Respondent does not dispute that the BOP's application of the Rule sometimes allows prisoners to earn ETCs when reasons beyond their control prevent them from actually taking part in programming. But Respondent refrains from addressing open-ended questions of fairness or consistency in favor of a focus on the language of the FSA. "[I]n deciding whether a prisoner has earned FSA credits," Respondent argues, "the only relevant question is whether the prisoner was in a position to 'successfully participate'" in EBRR programming or productive activities. *Id.* at 13.

## V. Legal Standards

### *A. Section 2241 Habeas Petitions*

Federal prisoners may petition a federal district court for habeas relief if they are "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Section 2241 allows a federal prisoner "to challenge the execution of (rather than the imposition of) his or her sentence." *Francis v. Maloney*, 798 F.3d 33, 36 (1st Cir. 2015). This includes challenges to the "computation of a prisoner's sentence by prison officials." *Dinkins v. Boncher*, No. 21-CV-11847-AK, 2022 WL 3021108, at *2 (D. Mass. July 29, 2022) (quoting *Thornton v. Sabol*, 620 F. Supp. 2d 203, 206 (D. Mass. 2009)). Under § 2241, petitioners bear the burden of proving that their detention violates their federal rights. *See Espinoza v. Sabol*, 558 F.3d 83, 89 (1st Cir. 2009). "A petition under § 2241 must be brought in the district where the prisoner is incarcerated, and must follow exhaustion of all available federal administrative remedies." *Carter v. Grondolsky*, No. 12-CV-11426-RWZ, 2014 WL 7404560, at *3 (D. Mass. Dec. 30, 2014) (citations omitted) (first citing *United States v. Barrett*, 178 F.3d 34, 50 n.10 (1st Cir. 1999); then citing *Sayyah v. Farquharson*, 382 F.3d 20, 24 (1st Cir. 2004)).

### *B. Motions to Dismiss*

Respondent has filed a pre-answer motion to dismiss, which is permissible under the Rules Governing Section 2254 Cases in the United States District Courts (which may, in turn, be applied to petitions under § 2241). *See* Docket No. 21; *Walsh v. Boncher*, 652 F. Supp. 3d 161, 164 (D. Mass. 2023). The Court considers "a motion to dismiss a habeas petition according to the same principles as a motion to dismiss a civil complaint under Federal Rule of Civil Procedure 12(b)(6)." *Id.* (quoting *Cardoza v. Pullen*, No. 22-CV-00591-SVN, 2022 WL 3212408, at *3 (D. Conn. Aug. 9, 2022)). In considering a motion to dismiss, the Court must accept all well-pleaded facts as true and draw all reasonable inferences in favor of the petitioner.

*See Gilbert v. City of Chicopee*, 915 F.3d 74, 80 (1st Cir. 2019). A petition may survive a motion to dismiss only if it contains facts that, accepted as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

On a motion to dismiss, a Court may typically consider only the complaint itself, documents attached to it, and documents expressly incorporated by reference. *Foley v. Wells Fargo Bank, N.A.*, 772 F.3d 63, 71–72 (1st Cir. 2014). Generally, if the Court considers material outside the pleadings on a motion to dismiss, the motion is, under Federal Rule of Civil Procedure 12(d), converted to a motion for summary judgment. *See* Fed. R. Civ. P. 12(d); *see, e.g.*, *Raimondoray v. Grondolsky*, No. 11-CV-12268-GAO, 2012 WL 3202892, at *1 (D. Mass. Aug. 2, 2012) (converting the respondent warden's motion to dismiss a § 2241 habeas petition to a motion for summary judgment). "There is, however, a narrow exception 'for documents the authenticity of which are not disputed by the parties; for official public records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint.'" *Alt. Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001) (quoting *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993)). In deciding motions to dismiss habeas petitions that challenge the computation of a prisoner's release date, this Court has applied the exception to consider declarations from BOP officials. *See, e.g.*, *Nygren v. Boncher*, 578 F. Supp. 3d 146, 149 n.1 (D. Mass. 2021) ("[T]he court will accept the Declaration without converting the motion to dismiss into a motion for summary judgment."). I do the same here and consider the affidavit and BOP records submitted by Respondent (Docket No. 31-1).

## VI. Analysis

I note at the outset that the circumstances leading to the BOP's denial of ETCs to Mr. Dunlap are palpably unfair. He plainly sought to participate in programming, as reflected by his

participation in the programming that was available to him at Wyatt. Encouraging a desire to partake in programming and reduce a prisoner's risk of recidivism is a major purpose of the FSA. Yet, presumably for administrative reasons, the BOP shuttled Mr. Dunlap to Wyatt and left him there for 53 days without access to BOP-assigned EBRR programming, all to attend a court hearing of a few hours' duration.

Meanwhile, in other instances where the BOP fails to provide programming, it routinely awards ETCs to prisoners who do not complete any EBRR programming, provided that they are willing and otherwise able. Failing to make EBRR programming available to eligible prisoners goes against the spirit of the FSA, and denying an eligible prisoner ETCs after making his participation impossible is salt in the wound.[5]

The Court's authority here is limited to determining whether Mr. Dunlap has stated a cognizable claim that his detention (specifically the computation of his ETCs) violates the Constitution or laws of the United States. The relevant law, in this case, is the FSA. In other words, even in the face of obvious unfairness, I am constrained to consider only whether the Rule, or the BOP's application of its Rule, contravenes the FSA or otherwise violates Mr. Dunlap's federal rights.

### ***A. The FSA's References to Successful Participation in EBRR Programming Necessarily Mean Participation in EBRR Programming that has Been Assigned by the BOP***

The analysis here starts with the language of the FSA. As required by *Loper Bright Enterprises*, I look for the statute's "single, best meaning," without any particular deference to the BOP's interpretation of the statute embodied in the Rule. *See* 144 S. Ct. at 2266.

[5] As discussed below, making it impossible for an eligible prisoner to participate in EBRR programming may run afoul of the explicit requirements of the FSA, but that argument has not been raised in this case.

The FSA provides that an eligible prisoner "who successfully completes evidence-based recidivism reduction programming or productive activities, shall earn time credits." 18 U.S.C. § 3632(d)(4)(A). The FSA defines "evidence-based recidivism reduction program" to mean:

> [E]ither a group or individual activity that—
>
> (A) has been shown by empirical evidence to reduce recidivism or is based on research indicating that it is likely to be effective in reducing recidivism;
>
> (B) is designed to help prisoners succeed in their communities upon release from prison; and
>
> (C) may include—
>
> [enumerated topics and types of programming].

18 U.S.C. § 3635(3).

The statute does not define successful completion, and it does not explicitly state that the programming to be completed must be EBRR programming that has been assigned by the BOP. Nonetheless, reading the statute as a whole, it is evident that the statute contemplates completion of EBRR programming that has been assigned by the BOP.

The statute is designed to permit prisoners to receive ETCs for participating in assigned EBRR programs (*see* § 3632(d)(4)(A)), and it requires the BOP to make such assignments, through the implementation of a required "System." Notably, the statute provides:

> The System shall provide guidance on the type, amount, and intensity of evidence-based recidivism reduction programming and productive activities that shall be assigned for each prisoner, including—
>
> (1) programs in which the Bureau of Prisons shall assign the prisoner to participate, according to the prisoner's specific criminogenic needs; and
>
> (2) information on the best ways that the Bureau of Prisons can tailor the programs to the specific criminogenic needs of each prisoner so as to most effectively lower each prisoner's risk of recidivism.

§ 3632(b).

There is nothing in the text of the FSA that can be read as suggesting that the EBRR programming to be "successfully complete[d]" could refer to anything other than the assigned EBRR programming described in the immediately adjacent sections of the statute. Reading the statute otherwise would strain the statutory language. The FSA is plainly designed to, and does, create a system whereby programming is matched to prisoners' needs, and credits are meted out for successful participation in such tailored programming. It would make no sense to mandate a system for identifying and assigning appropriate EBRR programming (and to link ETCs to the successful completion of such programming) if participation in other programming (of whatever description) could earn a prisoner ETCs without regard to whether that programming is appropriate to that prisoner's needs.

***B. The BOP's Obligation to Provide Programming***

The statute requires the BOP to assign appropriate programming "to ensure that . . . all prisoners at each risk level have a meaningful opportunity to reduce their classification during the period of incarceration" and "are able to successfully participate in such programs." § 3632(a). Plainly, the FSA obligates the BOP to make programming available to eligible prisoners. But the limits of that duty are not obvious, and the term "meaningful opportunity" does little to elucidate the point.

The reality is that the BOP does not always make programming available to eligible prisoners. In some instances, it may be impracticable to do so. For example, it probably would not have been practicable to make programming available to Mr. Dunlap during the days (presumably less than a week) when he was actually traveling between Devens and Wyatt and Wyatt and the court.

In other instances, however, the BOP appears to practice a "let's-not-and-say-we-did" approach, whereby the BOP awards ETCs to prisoners who, though willing, have *not* actually

participated in programming.[6] Although it is questionable whether this approach comports with the BOP's obligations under the FSA, the practice does not seem to engender any complaints from prisoners; unsurprisingly, I have identified no cases challenging a grant of unmerited ETCs.

That the BOP adopts a liberal approach to awarding ETCs in other circumstances does not really help Mr. Dunlap. He cannot rest a claim for relief on an assertion that, because other prisoners sometimes receive unearned ETCs, he should too. Mr. Dunlap does not argue that the BOP shirked its statutory duties by sending him to Wyatt for nearly two months in 2022, without making provision for him to continue in EBRR programming, and the record is insufficiently developed to allow the Court to determine: (a) whether it was predictable that Mr. Dunlap would be held at Wyatt for so long, and (b) whether it would have been practicable to assign programming while Mr. Dunlap was at Wyatt or to review the appropriateness for Mr. Dunlap of the programming that was available at Wyatt.

It is not clear why the BOP failed to assign Mr. Dunlap to particular programming while he was at Wyatt. Plainly there was some programming available there, so the BOP would need only to review the offerings to determine which ones might have been appropriate for Mr. Dunlap. Indeed, the supplemental authority submitted by Mr. Dunlap, *Sharma v. Peters*, No. 24-

---

[6] As noted above, Respondent acknowledges that,

> Under BOP's time credit regulations, inmates automatically earn one day of programming credit for each day that passes, without regard to program completion or the number of hours actually spent in any particular program or activity, provided the inmate does not fall within one of the categories [establishing ineligibility] enumerated in 28 C.F.R. § 523.41(c)(4) (discussed below). In practice, this means inmates are not necessarily required to be participating in EBRR/[productive activities] specifically recommended to them on a particular given day to earn credits. Rather, an inmate must be willing, and in a position to, participate in EBRR/[productive activities] specifically recommended to the inmate by prison officials under the risk and needs assessment system.

Docket No. 31, at 4 (citations omitted).

CV-158-RAH-KFP, 2024 WL 4668135 (M.D. Ala. Nov. 4, 2024), found—albeit in somewhat different circumstances—that the FSA obligates the BOP to make programming available to prisoners who are housed outside BOP facilities. In *Sharma*, the court noted that inmates like Sharma, who was housed in a Special Housing Unit during most of the time for which he sought to claim ETCs, "should not be prevented from earning [ETCs] based on a BOP designation system that prevents inmates from earning these time credits even though under the language of the statute there has been a determination that they are eligible to receive them." *Id.* at *9.

I agree with the court in *Sharma* that the FSA does not automatically excuse the BOP from its obligation to assign EBRR programming for prisoners whenever the BOP lodges prisoners in a non-BOP facility. Unlike the court in *Sharma*, however, I am not persuaded that the FSA requires the BOP to give ETCs for periods during which a prisoner has not successfully participated in BOP-assigned EBRR programming. It is difficult to discern much consistency in the BOP's practices, which sometimes grant ETCs to prisoners without regard to any actual participation, but that does not mean that the FSA creates an entitlement to receive ETCs under such circumstances.

To put it another way, there is considerable force to Mr. Dunlap's contention that the BOP's distinction between "ineligibility" to earn ETCs and mere impossibility is more semantic than real. But there are practical limitations on assigning and offering EBRR programming. The FSA cannot be understood to require the BOP to offer EBRR programming when it is impracticable to do so. Thus, the BOP's Rule appears facially valid in "generally" denying ETCs to prisoners during periods of "[t]emporary transfer to the custody of another Federal or non-Federal government agency (*e.g.*, on state or Federal writ, transfer to state custody for service of sentence, etc.)." 28 C.F.R. § 523.41(c)(4). In other words, it is reasonable to suppose that it will

often be impracticable to make meaningful EBRR programming available to prisoners who are in transit. But it cannot be that the FSA permits the BOP to put a prisoner in "travel status" for months on end for no obvious reason,[7] without making a reasonable effort to provide suitable programming.[8] It may be that prisoners who find themselves on "travel status" for an extended period could argue—as did Sharma, who was in a Special Housing Unit for much of the time at issue—that the BOP is required to make suitable programming available to them. But even assuming that to be so, it does not answer the question in this case. At this point, Mr. Dunlap does not seek BOP-assigned programming, rather, he seeks ETCs for a period over two years ago during which he was unable—albeit through no fault of his own—to complete assigned programming.

### *C. The BOP's Rule*

As noted, Respondent draws a sharp distinction between being "eligible" to participate in EBRR programming and being eligible but nonetheless unable to successfully participate in such programming. Indeed, this distinction is essential to Respondent's position, since ineligibility is defined by the FSA, *see* 18 U.S.C. § 3632(d)(4)(D)–(E), and is not subject to modification by

[7] There is no suggestion in this case that the BOP acted in bad faith, and I assume that Mr. Dunlap's cumbersome travel arrangements were the product of some administrative expediency.

[8] This should not be read to suggest that failures to provide programming or to award ETCs are acceptable merely because the time periods at issue may be short. *Cf. Borker v. Bowers*, No. CV 24-10045-LTS, 2024 WL 2186742, at *3 (D. Mass. May 15, 2024) ("The respondent seeks to minimize the effect of [BOP's practice of not assigning programming until a prisoner arrives at their designated facility], suggesting Borker waited 'only' a couple of months for his transfer and claiming the BOP did not 'delay' the transfer. None of this, however, avoids the fact that the regulation, policy, and practice at issue worked a violation of Borker's rights under federal law. The violation persisted over a period of eighty-one days, during which Borker otherwise might have accrued (at least) twenty-seven days of time credit under the calculus set out in the FSA. To the extent the respondent believes the prospect of securing release nearly a month earlier is de minimis, the Court disagrees." (footnote omitted) (citation omitted)).

agency rule. On its face, the BOP's Rule refers to the statutory ineligibility criteria without expanding them. *See* 28 C.F.R. § 523.41(d).

Mr. Dunlap argues, however, that the Rule (or the BOP's application of the Rule) has effectively rendered him ineligible because it states that prisoners on a writ "will generally not be considered to be 'successfully participating' in EBRR Programs." § 523.41(c)(4).

I find that the Rule did not render Mr. Dunlap ineligible. The Rule lists circumstances that *generally* make it difficult or impossible for a prisoner to access or participate in EBRR programming. But it does not create a categorical bar, which would be an improper constriction of the eligibility established by the FSA. Rather, the Rule articulates a presumptive, but flexible bar. *See Pelullo v. FCC Coleman - Low*, No. 23-CV-189-WFJ-PRL, 2024 WL 3771691, at *4 (M.D. Fla. Aug. 13, 2024) ("Said circumstances are therefore not absolute bars on earning time credits under the Rule—they are presumptive bars. And these presumptive bars make sense."). The fact that the Rule lists circumstances under which prisoners are typically unable to successfully participate in programming does not bring the Rule into conflict with the text of the FSA.

I note that, if the Rule were inflexibly applied, it might be deemed an impermissible absolute bar. But there is nothing before the Court to suggest that this is the case. Rather, as the court noted in *Pelullo*, the question is whether, *as applied* in particular circumstances, the Rule works a violation of the FSA:

> This petition is about whether Petitioner may earn time credits under the First Step Act ("FSA"), 18 U.S.C. § 3632(d)(4), for completing Bureau of Prisons ("BOP") programming while housed in BOP facilities on writ with the United States Marshal Service ("USMS"). The Court finds, in this "as applied" ruling, that Petitioner may so qualify. In Petitioner's case BOP cannot, through administrative rule, categorically deny "successful participation" status to him for completing qualifying BOP programming in BOP institutions just because he was on a USMS writ. This conflicts with the FSA's eligibility provisions.

*Id.* at *1.

Unlike the circumstances in *Pelullo*, this is not a case in which a prisoner has been denied ETCs *merely* because he was on a writ. Rather, Mr. Dunlap was denied ETCs because he was in a location where he was unable to access BOP-assigned EBRR programming, and so could not "successfully participate."[9]

***D. "Successful Participation"***

Having concluded that the BOP's Rule did not constitute an improper addition to the FSA's enumerated categories of prisoners who are "ineligible" to earn ETCs, I turn to the question of whether the Rule's definition of "successful participation"—or the BOP's application of the Rule to Mr. Dunlap—conflicts with the FSA.

The FSA does not itself define successful participation, and, as previously discussed, the Rule defines successful participation, in part, as generally being incompatible with a prisoner being on a writ. *See* 28 C.F.R. § 523.41(c)(4). In applying the Rule to Mr. Dunlap, the BOP mechanically determined that he had not successfully participated in EBRR programming while he was at Wyatt because there was no BOP-assigned programming available in which for him to participate.[10] As discussed above, the FSA specifically contemplates that prisoners will

[9] Respondent's brief cites a number of cases to support the proposition that prisoners may be barred from earning ETCs while on a writ, including at least one case where the prisoner was housed at a BOP facility while on the writ. *See* Docket No. 31, at 11. Respondent acknowledges that the cited cases were decided before *Loper Bright Enterprises*. *See id.* at 11 n.7. Following *Loper Bright Enterprises*, courts are not required to defer to an agency's interpretation of a silent or ambiguous statute, and it seems doubtful that a blanket rule that denied ETCs to all prisoners on a writ without regard to their actual participation in BOP-assigned programming would stand. But that question is not before me.

[10] It is not clear whether there was programming available at Wyatt that would have been appropriate for Mr. Dunlap and that the BOP could have assigned to him. As noted above, Mr. Dunlap does not argue that the BOP violated the FSA by failing to assign him programming.

participate in *BOP-assigned* EBRR programming, and there is nothing anomalous in defining "successful participation" in a program to mean actually taking part in the program. Therefore, I am constrained to find that, because Mr. Dunlap was unable to participate in BOP-assigned programming while housed at Wyatt, the BOP's application of its Rule to deny him ETCs for that time does not conflict with the plain meaning of the FSA.

Whether the BOP failed in an obligation to make EBRR programming available during Mr. Dunlap's stay at Wyatt is a separate question—one that is not squarely before the Court and that would require a more developed record. As noted above, given that the events at issue occurred over two years ago, it is doubtful that the Court could fix that problem at this point.

To state the obvious, there is considerable inconsistency and unfairness in the BOP's decision. As noted above, the BOP's application of its Rule is such that some eligible prisoners who are willing and able to participate in EBRR programming are deemed to "successfully participate," and thus earn ETCs when they have not actually participated in a program (*e.g.*, when a prisoner is on the waitlist for a program or when a prisoner has arrived at their designated BOP facility but has not yet been assigned to programming). *See* Docket No. 31-1, ¶¶ 17, 19. By contrast, the BOP has denied Mr. Dunlap ETCs when he was not only willing to participate in programming—but actually participated in the programming that was available to him. It is hard to understand why ETCs would be awarded to a prisoner at a BOP facility who is on a waitlist for programming but not to a prisoner on a writ at a non-BOP facility. In each case, these are prisoners who wish to participate but cannot because the BOP has failed to make programming available. It may well be that it is impracticable to provide programming for prisoners who are actually in transit. But when prisoners are parked at non-BOP facilities for extended periods of

time, it is difficult to see how the BOP can be said to comply with the FSA if it fails to provide such prisoners the programming needed to earn ETCs.

In short, there are glaring inconsistencies in the BOP's practices. But the Court does not serve as a guardian of consistency or generalized fairness. The Court's role is limited to determining whether the BOP has run afoul of federal law in its treatment of Mr. Dunlap. I find that the Rule's definition of "successful participation" and the BOP's application of the Rule here do not conflict with the statutory requirements of the FSA.[11]

CONCLUSION

For the foregoing reasons, I recommend GRANTING Respondent's Motion to Dismiss.[12]

/s/ Paul G. Levenson
Paul G. Levenson
U.S. MAGISTRATE JUDGE

Dated: December 13, 2024

[11] I have little doubt that, under the FSA, the BOP *could* write a broader rule that would allow prisoners to earn ETCs in situations where they presently cannot, but the question before me is only whether the Rule and its application here are consistent with the FSA.

[12] The parties are advised that under the provisions of Federal Rule of Civil Procedure 72(b), any party who objects to this recommendation must file specific written objections thereto with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation. *See Keating v. Secretary of Health & Human Servs.*, 848 F.2d 271 (1st Cir. 1988); *United States v. Valencia-Copete*, 792 F.2d 4 (1st Cir. 1986); *Scott v. Schweiker*, 702 F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378–79 (1st Cir. 1982); *Park Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603 (1st Cir. 1980); *see also Thomas v. Arn*, 474 U.S. 140 (1985).